**Marc Belding ANDERSON et al., Plaintiffs-Appellants,**

v.

**General Lewis B. HERSHEY, National Director, Selective Service System, et al., Defendants-Appellees.**

No. 18976.

United States Court of Appeals Sixth Circuit.

April 11, 1969.

---

David Y. Klein, James T. Lafferty, Detroit, Mich., for appellants.

Robert V. Zener, Dept. of Justice, Washington, D. C., for appellees, Edwin L. Weisl, Jr., Asst. Atty. Gen., Morton Hollander, Attys., Dept. of Justice, Washington, D. C., Lawrence Gubow, U. S. Atty., Detroit, Mich., on brief.

Before PHILLIPS, COMBS, and COFFIN*, Circuit Judges.

COFFIN, Circuit Judge.

At some time between October, 1967, and January, 1968, each of the appellants in this case intentionally dispossessed himself of either or both his selective service registration and/or classification cards. On October 24, 1967, General Hershey, the National Director of the Selective Service System, issued "Local Board Memorandum 85" which directed local boards to reclassify as delinquents all registrants who abandoned or mutilated their registration and/or classification cards.[1] Each of the appellants was subsequently reclassified under the Delinquency Regulations, 32 C.F.R. § 1642.[2] Appellants then brought an action in the United States District Court for the Eastern District of Michigan seeking injunctive and declaratory relief against their respective local boards. In response to the government's motion, the district court dismissed the action as to nineteen of the appellants and reserved action as to five appellants pending receipt of further information.[3] The district court's dismissal was based on a holding that plaintiffs were not deprived of their constitutional rights, that the Delinquency Regulations were valid, and that judicial review of appellants' classifications was barred by § 10(b) (3) of the Selective Service Act, 50 App. U.S.C. § 460(b) (3).

As with other courts we have waited for Oestereich v. Selective Service System, etc., 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968). We now have the illumination not only of *Oestereich,* but

---

* The Honorable Frank M. Coffin, United States Circuit Judge, First Circuit, sitting by designation.

1. Local boards were given the following advice in the Memorandum:

   "Whenever a local board receives an abandoned or mutilated registration certificate or current notice of classification which had been issued to one of its own registrants, the following action is recommended:

   (A) Declare the registrant to be delinquent for failure to have the card in his possession.

   (B) Reclassify the registrant into a class available for service as a delinquent.

   (C) At the expiration of the time for taking an appeal, if no appeal has been taken, and the delinquency has not been removed, order the registrant to report for induction or for civilian work in lieu of induction if in Class I-O, as a delinquent, or in the board's discretion in a flagrant case, report him to the United States Attorney for prosecution."

2. Prior to reclassification appellants could be divided according to the following classifications: 1-A, II-S (undergraduate student), 1-Y (registrant unable to satisfy physical or mental standards for I-A, I-A-O, or I-O, but who could serve in time of national emergency), and III-A (registrant with child or children or deferred because of hardship to dependents).

3. As of the date of argument in this case the district court had taken no further action with regard to these five plaintiffs.

also of Clark v. Gabriel, 393 U.S. 256, 89 S.Ct. 424, 21 L.Ed.2d 418 (1968). But the light focuses only at the ends of our particular stage, not the center. For *Oestereich* dealt with, and was meticulously confined to, the application of the delinquency regulations to a statutory exemption, while *Gabriel* dealt with a pre-induction attack based on specific allegedly improper considerations motivating a decision to reclassify.[4] The middle ground remains for us: not the bringing to bear of specific factual judgments on a particular case, not a deprivation of a statutory exemption by the delinquency regulations, but the deprivation of statutorily defined deferments by the same regulations.

It is not only possible but plausible to construct, as appellants in effect have done, a syllogism: *Oestereich* decrees that use of the delinquency regulations to take away a Congressionally granted exemption for "activities or conduct not material to the grant or withdrawal of the exemption" is "blantantly lawless"; a deferment, particularly a student deferment, is a comparable status, also legislatively defined; it is therefore equally immune from the application of the delinquency regulations.[5] See also Breen v. Selective Service Local Board No. 16, 406 F.2d 636, 2d Cir., January 10, 1969, dissenting opinion of Judge Feinberg.

We decline to adopt the syllogism. We note first that the Court restricted itself to the statutory exemption problem, without giving any clear guidelines of the intermediate situation confronting us.

This restraint forces us to ask the basic question: is there any significant difference, so far as delinquency reclassification is concerned, between a statutory exemption and a statutory deferment? If there is, we ask the further questions: Does the procedure have a reasonable basis? Does it have any legislative or judicial sanction? Is it nevertheless a penal provision, so that unilateral agency action is proscribed?

The Court in *Oestereich* did not articulate any difference between exemption and deferment. The presence of any difference is divined only from its repeated confinement of its ruling to the case of one exempt by statute. We are forced to probe the question whether there is a significant difference in the status (exemption versus statutory deferment) being altered by the delinquency regulations. We think such a difference exists. In the case of an exemption, the Congress has made the decision that qualifying persons shall be beyond the pool of manpower available for military purposes. In the case of a deferment, the Congress has tried to set priorities, to provide predictability, and to guarantee equality of treatment—but not immunity—for those within the available pool of manpower. An exempt person is predetermined to be outside the system; a deferred person is within the system. We deem this is a significant line of demarcation.

If a person is outside the system, the performance or nonperformance by him of such collateral duties as possessing his

4. Prior to the Supreme Court's opinion in Clark v. Gabriel, *supra*, there had been suggestions in some lower court opinions that § 10(b) (3) was an unconstitutional restraint of judicial review, Petersen v. Clark, 285 F.Supp. 700 (N.D.Cal.1968) or that § 10(b) (3) was inapplicable in cases involving First Amendment questions, Wolff v. Selective Service Local Board No. 16, 372 F.2d 817 (2d Cir. 1967). *Gabriel*, while upholding the validity of § 10(b) (3), also made clear that the Congressional prohibition of pre-induction review was not absolute. It is not enough, however, to assert that one's classification was arrived at in violation of the Constitution. *See* n. 11, *infra*.

5. We could add that pre-induction challenges of delinquency revocations of statutory deferments would meet the criteria of avoiding the review of a complex factual determination and of posing a question (the validity of regulations) beyond the competence of a Selective Service board, discussed by Mr. Justice Harlan in his concurring opinion in *Oestereich*; and that the *Oestereich* dissenters in their footnote 9 intimated that the reasoning of the majority "may just as plainly" apply to student deferments.

registration certificate will have only a minimal effect on the functioning of the system. Perhaps the only effect would be to increase a local board's difficulty in reclassifying him should his status change (e. g., should a clergyman withdraw from his profession) and should he not notify the board of this change or of a change of address.[6] But in the case of a deferred person, the impingement on the system of failure to perform a wide range of collateral duties—registration itself, returning a completed Classification Questionnaire, notifying a board of change of status or address, reporting for a medical interview or physical examination, possessing a certificate, providing evidence that the registrant is satisfactorily pursuing a full-time course of instruction, etc.—is substantial. Coming specifically to undergraduate (II–S) deferments, on which appellants lay greatest stress, we observe that the regulations are on the one hand designed to insure to the student both predictability and equality of treatment; on the other hand, they seek to insure sufficient information both in the files of the system and in the possession of the individual, United States v. O'Brien, 391 U.S. 367, 379, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), so that a continuing relationship may make feasible response to changed conditions—e. g., a change of status by the registrant or a finding by the President in accordance with section 6(h) (1) of the Selective Service Act, 50 U.S.C. App.

§ 456(h) (1), that the needs of the Armed Forces require a change in student deferment policies.

Were widespread failure to comply with the adjective requirements of the system to be subject only to the sanction of criminal prosecution, the effect on both the selective service system and individual violators would be unnecessarily harsh and burdensome. As to the former, the delay, the uncertainty of meeting time-limited quantitative goals,[7] the load on prosecutors and courts would vastly hobble its functioning. As to the latter, fines and jail sentences might in a large proportion of the cases be rightly deemed an excessive response. The concept of this lesser option of terminating or suspending a privilege for delinquency is not uncommon in organizations far less militarily oriented than Selective Service —e. g., clubs, unions, and educational institutions.[8] Moreover, the operation of the softer option of expedited processing due to delinquency has certain safeguards. There is a right to personal appearance and appeal, and a registrant's case may be reopened without the restrictions normally attached to that procedure. 32 C.F.R. § 1642.14. The delinquent status can be removed, 32 C.F.R. § 1642.4(a),[9] and, in fact, courts have insisted that minor lapses or oversights are not enough to justify the status, that something akin to bad faith must be satisfactorily established.[10]

---

6. Even this possibility would not apply to those whose status does not depend on occupation, such as veterans or sole surviving sons of families where the father or other brothers and sisters were killed in action.

7. Unlike other governmental agencies, the local boards of the Selective Service System must fill established monthly quotas. The nature of this obligation demands efficiency in operations which in turn necessitates the maximum availability of information concerning the status and location of registrants within the jurisdiction of the various local boards.

8. As to whether or not, in the circumstances before us, the delinquency regula-

tions can be construed as penal we discuss below.

9. Removal of delinquency is available only in the board's discretion but it has not been alleged that local boards have acted arbitrarily. Indeed, in this very case one of the original plaintiffs obtained the removal of his delinquency by requesting the return of his registration card.

10. See, e. g., United States v. Bruinier, 293 F.Supp. 666 (D.Or.1968) ; United States ex rel. Colby v. Commanding Officer, Armed Forces, etc., 281 F.Supp. 989 (E.D.N.Y.1968) ; Mintz v. Howlett, 207 F.2d 758 (2d Cir. 1953). See also Townsend v. Zimmerman, 237 F.2d 376 (6th Cir. 1956). Cf. Venus v. United States,

We therefore see a real difference in the logical nexus between the delinquency approach as applied to those holding deferments, even those statutorily defined, and such an approach to persons who are exempt.[11] It is perhaps not enough that

368 U.S. 345, 82 S.Ct. 384, 7 L.Ed.2d 341 (1961) ; Ward v. United States, 344 U.S. 924, 73 S.Ct. 494, 97 L.Ed. 711 (1953) ; Bartchy v. United States, 319 U.S. 484, 63 S.Ct. 1206, 87 L.Ed. 1534 (1943).

The regulations would also seem to allow an interim status where, although a registrant has failed to perform some duty, he is not yet an officially declared delinquent. 32 C.F.R. § 1602.4 defines "Delinquent" as "a person who fails or neglects to perform any duty required of him under the provisions of the selective service law." A board "may" declare such a registrant delinquent, but such action is not mandatory. 32 C.F.R. § 1642.4 (a) ; see, e. g., Boyd v. United States, 269 F.2d 607, 608 (9th Cir. 1959). Indeed the regulations seem to contemplate less drastic sanctions for those guilty of technical infractions. See, e. g., 32 C.F.R. § 1622.1(c) (failure to return Classification Questionnaire within specified time justifies a I-A classification) and United States v. Griffin, 378 F.2d 899, 901 (2d Cir. 1967). Local boards may also send registrants a delinquency warning, allowing them an opportunity to purge their delinquencies before they are declared delinquent. See Ginger, Minimum Due Process Standards in Selective Service Cases—Part I, 19 Hastings L.J. 1313, 1340 (1968).

Finally, we would observe the unique treatment given to criminal sanctions by the Selective Service System :

"55. Delinquents in General. Selective Service Regulations are designed to delay the prosecution of a violator of the law until after he has failed to report for or refused to submit to induction or assigned civilian work. [Footnote omitted.] This is to prevent, wherever possible, prosecutions for minor infractions of rules during his selective service processing, thereby reducing the number of cases that reach the courts and also giving the registrant, before being prosecuted, an opportunity to report for service in the armed forces. Since the purpose of the law is to provide men for the military establishment rather than for the penitentiaries, it would seem that when a registrant is willing to be inducted, he should not be prosecuted for minor offenses committed during his processing. The result of this procedure is that the great majority of prosecutions involve the failure to report for or refusal to submit to induction or assigned civilian work.

"The only other offense which is prosecuted with some frequency is failure to register. These prosecutions almost always end with the defendants submitting to registration and only in rare instances does the court prepare an opinion. * * *" Selective Service System, Legal Aspects of Selective Service (1969 ed.), 46–47.

Even with regard to induction itself, the registrant is given under Army Regulations "a last clear chance to change his mind and accept induction rather than certain indictment * * *." Chernekoff v. United States, 219 F.2d 721 (9th Cir. 1955). Failure to warn a registrant at the induction ceremony of the consequences of refusing induction can invalidate a conviction. Chernekoff v. United States, supra ; see also Ashton v. United States, 404 F.2d 95 (8th Cir. 1968).

11. We should add that while the reasoning of Mr. Justice Harlan in his concurring opinion in Oestereich, see n. 1, applies to the kind of challenge posed here by appellants, it would, if adopted as the determinant of pre-induction review, allow such review in an impermissibly large variety of cases. For example, challenge could be made to regulations denying counsel at personal appearances, denying access to records of draft board proceedings, denying the right of confrontation, permitting the use of hearsay evidence, or to the unrepresentative composition of the local board, or to lack of notice of impending reclassification. All would present general questions, not involving complex factual determinations, and beyond the competence of a local board. Yet similar attacks have been made in pre-induction cases and have uniformly been denied for lack of jurisdiction. See, e. g., Tamarkin v. Selective Service Local Draft Board No. 47, 243 F.2d 108, 109 (5th Cir.), cert. denied, 355 U.S. 825, 78 S.Ct. 33, 2 L.Ed.2d 39 (1957) (challenge to Selective Service physical examination procedure) ; Muhammad Ali v. Breathitt, 268 F.Supp. 63 (W.D.Ky.1967), stay denied, sub nom., Muhammad Ali v. Gordon, 386 U.S. 1002, 87 S.Ct. 1365, 18 L.Ed. 2d 451 (1967) (exclusion of negroes from local boards) ; Boyd v. Clark, 287 F.Supp. 561 (S.D.N.Y.1968), aff'd, 393 U.S. 316, 89 S.Ct. 553, 21 L.Ed.2d 511 (1969) (challenge of constitutionality of student deferment).

we see a rational relationship between the performance of duties required by the Selective Service Act and the merits of the classification of those holding statutory deferments. But we also perceive a legislative basis, not as sharply focused as it might be but nevertheless persuasive.

In the first place we note that the delinquency regulations constitute a not insignificant part of the total Selective Service regulations—nineteen separate sections in Part 1642. They were promulgated in substantially their present form pursuant to section 10 of the Selective Service Act of 1948, 62 Stat. 618. But the delinquency procedure has actually existed since the early 1940's. *See, e. g.,* United States v. Haug, 150 F.2d 911, 912 (2d Cir. 1945); Regulation 601.5. 6 Fed.Reg. 6825 (December 31, 1941). While it may be safely assumed under the doctrine of administrative construction that the Congress was not unaware of these regulations, assumption is no longer necessary in the light of its reference in the 1967 legislation, now 50 U.S.C. § 456(h) (1), to "prime age group" as "the age group from which selections for induction into the Armed Forces are first to be made after delinquents and volunteers." This seems to us to be a Congressional imprimatur, albeit an abbreviated one, on the delinquency procedures established by regulation.[12]

We note also the action of the Congress in 1961 in providing for the priority induction of a reservist or member of the Army or Air National Guard "who fails to serve satisfactorily during his obligated period of service". 50 U.S.C. App. § 456(c) (2) (D). While it could be argued that this positive legislation with regard to reservists and guardsmen negates the likelihood of Congressional approval in the absence of specific legislation, we conclude that Congress, realizing that local boards might look upon such persons as already in the military, wished to assure their prompt induction. Moreover, legislation was called for in the light of 50 U.S.C. App. 456(c) (1) and (2) which in practical effect exempted guardsmen and reservists from the draft. In other words, a statutory exception was made necessary by the statutory exemption. We cannot conceive that Congress would contemplate a priority induction for recalcitrant reservists while assuming that no such spur existed for the much larger reserve of manpower subject to the draft.

While the Supreme Court has not, as the length of this opinion evidences, spoken directly to the issue before us, we draw support from its actions in Shiffman v. Selective Service Board No. 5, 391 U.S. 930, 88 S.Ct. 1831, 20 L.Ed.2d 849 (1968) and Zigmond v. Selective Service Board No. 16, 391 U.S. 930, 88 S.Ct. 1831, 20 L.Ed.2d 851 (1968). In *Shiffman* the petitioner who held a II–A occupational deferment was declared delinquent and reclassified I–A when he turned in his draft card. In *Zigmond* the petitioner was classified I–A but since he was over 26 years of age he or-

---

12. We are mindful of Judge Feinberg's dissent in Breen v. Selective Service Local Board No. 16, *supra,* in which he criticizes the majority for undue stress on this "fleeting reference", particularly when the Selective Service System had unsuccessfully argued the point in *Oestereich.* But, with respect, we say, first, that reference to the fate of the argument in *Oestereich* assumes the ultimate issue of identity of statutory deferments and statutory exemptions and, second, that Judge Feinberg's interpretation reads "after delinquents" out of the statute. It could be argued that the delinquency provisions are inapplicable *only* to undergraduate II-S deferments. *See* Kolden v. Selective Service Local Board No. 4, 406 F.2d 631 (8th Cir., January 28, 1969). Thus, in *Kolden* the court held that graduate II-S deferments could be removed by delinquency proceedings, but suggested that undergraduate II-S deferments could not be so removed. We do not find this distinction persuasive for the reasons discussed in the text. We would add only that whatever differences exist in the statute between undergraduate and graduate II-S deferments bear, in our opinion, on the initial availability of the deferments and not on the applicability of delinquency proceedings.

dinarily would not have faced induction. However, upon turning in his draft card, petitioner was declared delinquent and ordered to report for induction. In both cases the registrant sought a stay of induction which was denied by the Supreme Court.[13]

While we face no constitutional question in the use of the delinquency procedure to interfere with protected speech, United States v. O'Brien, *supra,* we do face such a question in the contention that the regulations were used punitively and that the local boards are placed in the inconsistent roles of prosecutor, judge, and jury.

In Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), the Supreme Court held unconstitutional a federal statute which divested of citizenship persons who remained outside of the country during wartime in order to avoid service in the armed forces. In this opinion the Court set forth several guidelines to be applied in determining if a particular action was punitive. Thus, the Court asked:

> "* * * Whether the sanction involves an affirmative disability or restraint, whether it historically has been regarded as punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an

alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned * * *." 372 U.S. at 168–169, 83 S.Ct. at 567.

We think it clear that induction into the armed services involves a restraint. The availability of habeas corpus to obtain release from the armed forces supports such a view. See, e. g., Eagles v. United States ex rel. Samuels, 329 U.S. 304, 67 S.Ct. 313, 91 L.Ed. 308 (1946). On the other hand, induction is far less severe action than is divestment of citizenship which was involved in Kennedy v. Mendoza–Martinez, *supra.*[14] Moreover, induction has *not* historically been regarded as punishment. In fact, quite the contrary is the case. See, Selective Draft Law Cases, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349 (1918).

Perhaps the strongest factor pointing toward punitive use of the delinquency provisions is the fact that the conduct involved in this case was itself the basis for a criminal prosecution.[15] This in turn lends superficial support to the argument that the aims of delinquency reclassification in this case were retribution and deterrence. However, the elements of retribution and deterrence appear only in so far as they are always present in any compliance-securing process. They are not present in the same form or with the same force as in criminal proceedings.[16] Finally, as we have

---

13. We note that as a practical matter petitioner in *Zigmond* would likely have been permanently outside the manpower pool since he was over 26 years of age. Nevertheless, the Supreme Court refused to grant a stay of induction which would have been tantamount to pre-induction review. See Zigmond v. Selective Service Local Board No. 16, 396 F.2d 290 (1st Cir. 1968).

14. The Supreme Court has suggested that the use of denationalization in punitive fashion would violate the Eighth Amendment as Cruel and Unusual punishment. See Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (Opinion of Chief Justice Warren).

15. *See* 50 App.U.S.C. § 462(a). The question of whether the Delinquency Regulations operate only upon a finding of scienter is difficult to answer. By the literal terms of the regulations scienter is not required. On the other hand, as a practical matter the provisions seem to be used only in wilful cases. See n. 10, *supra.*

16. Indeed, in view of the opportunity to have a delinquency reclassification removed we question whether retribution can be ascribed as a goal of the delinquency regulations. See n. 10, *supra.*

earlier indicated, the delinquency provisions are directed toward insuring the satisfaction of the legitimate needs of the Selective Service System. We cannot say that delinquency reclassification and induction are excessive. In short we do not believe that delinquency proceedings involve that quality of treatment which in our legal system necessitates the use of criminal proceedings.[17]

Up to this point we have discussed the application of the delinquency regulations to undergraduate II–S deferments. Having upheld the validity of the delinquency regulations in that context, we hold that they may be applied *a fortiori* to I–A, I–Y, and III–A classifications. Of course, I–Y registrants who are declared delinquent and ordered to report for induction may ultimately be rejected for service because of the factors which originally led to their I–Y classification.[18]

 Thus, we affirm the opinion of the district court. Appellants may, of course, seek to challenge their classifications as having no basis in fact either on habeas corpus after induction, or as a defense to a criminal prosecution for refusal to submit to induction. Normally, their failure to exhaust the administrative remedies provided by 32 C.F.R. § 1642.14 would be a bar to judicial review. *See, e. g.,* Dunn v. United States, 383 F.2d 357 (1st Cir. 1967), *cert. denied,* 390 U.S. 982, 88 S.Ct. 1103, 19 L.Ed.2d 1280 (1968); Ashton v. United States, 404 F.2d 95 (8th Cir. 1968); Campbell v. United States, 396 F.2d 1 (5th Cir. 1968); United States v. Hogans, 369 F.2d 359 (2d Cir. 1966). However, there is no indication that appellants were apprised of the existence of the administrative remedies. Therefore, we believe that fairness will be served by requiring the Selective Service System to give appellants the opportunity to utilize their administrative remedies and thereby open the possibility that the delinquency may be cured.

Affirmed.

COMBS, Circuit Judge (dissenting).

I am of the opinion that the delinquency regulations are punitive and for this reason invalid. I, therefore, respectfully dissent.

---

17. We recognize that Local Board Memorandum No. 85 could be said to indicate a punitive purpose underlying the delinquency regulations. We do not condone the issuance of this memorandum but we believe that its evil existed in its unauthorized use, *Oestereich, supra;* Wolff v. Selective Service Local Board No. 16, 372 F.2d 817 (2d Cir. 1967), rather than in its basic content.

18. The induction of registrants formerly classified III–A might well result in hardship to dependents. Indeed, one can imagine a case where dependents would become public charges. However, Congress has not seen fit to grant an exemption to persons qualifying for a III–A classification. Moreover, we note that if appellant's view were adopted, criminal prosecution and conviction would result in even greater hardship to dependents of registrants formerly classified III–A. Finally, we note that the 1967 changes in the Selective Service Act Regulations restricted the availability of III–A deferments in order to prevent "pyramiding" deferments into an exemption. 32 C.F.R. § 1622.30(a) (1967); H.R. No. 267, 90th Cong., 1st Sess., 1967 Code Cong. & Admin.News, pp. 1308, 1324.