**UNITED STATES of America,
Plaintiff,**

v.

**Edward James MALLORY, Defendant.**

**Crim. No. 42742.**

United States District Court
N. D. California.

Nov. 3, 1969.

Cecil F. Poole, U. S. Atty., F. Steele Langford, Asst. U. S. Atty., San Francisco, Cal., for plaintiff.

Manzella & Flenniken, Joseph Manzella, William Flenniken, Jr., San Francisco, Cal., for defendant.

**ORDER GRANTING MOTION FOR JUDGMENT OF ACQUITTAL**

ZIRPOLI, District Judge.

In July 1968 Edward Mallory burned his registration certificate and classification notice and forwarded the remains to his local Selective Service board. In August the board, pursuant to the delinquency regulations [1] reclassified him from II–S to I–A delinquent. One month later he was ordered to report for induction. At the designated time and place for his induction he refused to take the preinduction physical and stands before this court under indictment for violation of 50 U.S.C.App. § 462 (refusal to submit to induction).

1. 32 C.F.R. §§ 1642.1–1642.46. Hereinafter all Selective Service regulations shall be cited as "Reg. ——."

The government grants that if petitioner had had an "exemption" rather than a "deferment" his reclassification based solely on his act of returning his draft card would be unlawful. The United States Supreme Court clearly held in Oestereich v. Selective Service System Local Board No. 11, Cheyenne, Wyo., 393 U.S. 233, 237, 89 S.Ct. 414, 416, 21 L.Ed. 2d 402 (1968), that "once a person registers and qualifies for a statutory exemption, we find no legislative authority to deprive him of that exemption because of conduct or activities unrelated to the merits of granting or continuing that exemption."

■ A number of courts have dealt in some form or another with the delinquency provisions as applied to holders of deferments.[2]

The two most persuasive cases are Anderson v. Hershey, 410 F.2d 492 (6th Cir. 1969), which held the delinquency reclassification scheme lawful and United States v. Eisdorfer, 299 F.Supp. 975 (E.D.N.Y.1969), which held such scheme as unauthorized and unconstitutional. This court finds the opinion by Judge Dooling in Eisdorfer the most compelling.

However, it may be beneficial to discuss the basic issues in a somewhat different light and to focus closely upon the similarity between deferments and exemptions.

· The argument put forth by the government and supported by the majority in Anderson is that an exemption puts a person "outside of the system." A comparison of the IV–D exemption involved in Oestereich and the II–S deferment involved here belies the conclusion of the Anderson court.

Under section 6(g) of the Selective Service Act, 62 Stat. 611, as amended, 50 U.S.C.App. § 456(g), a student preparing for the ministry is only entitled to his exemption while "satisfactorily pursuing full-time courses of instruction in recognized theological or divinity schools." (See Reg. 1622.43a(3).) Under section 6(h)(1) of the same Act, 50 U.S.C.App. § 456(h)(1), a student preparing for a baccalaureate degree is only entitled to his deferment while "satisfactorily pursuing a full-time course of instruction at a college, university, or similar institution of learning." (See Reg. 1622.25.)

2. A number of cases either in holding, dicta, or reasoning uphold the delinquency reclassification procedures. Anderson v. Hershey, 410 F.2d 492 (6th Cir. 1969). Breen v. Selective Service Local Board No. 16, Bridgeport, Conn., 406 F.2d 636 (2d Cir. 1969), limited itself primarily to the question of whether a student reclassified pursuant to the delinquency provisions could attack such a reclassification prior to induction. Kraus v. Selective Service System Local 25, 408 F.2d 622 (4th Cir. 1969), dealt with a person holding a III–A dependency deferment who was reclassified I–A delinquent after turning in his draft card; this case also dealt basically with the availability of pre-induction review. United States v. Gutknecht, 406 F.2d 494 (8th Cir. 1969) considered the delinquency regulations as applied to a registrant already classified I–A who then turned in his draft card. The court argued that because he was I–A his designation as I–A delinquent was not a reclassification. However, this argument overlooks the fact that as I–A delinquent he is liable to priority induction and therefore is being called out of normal order because, and solely because, of his act of turning in his draft card. Kolden v. Selective Service Local Board No. 4, Beltrami County, Minn., 406 F.2d 631 (8th Cir. 1969), accepted the distinction between a deferment and an exemption and therefore never got to "the merits of his [appellant's] contentions." (Id., at 635). There are two cases holding the delinquency reclassification scheme unconstitutional. United States v. Eisdorfer, 299 F.Supp. 975 (E.D.N.Y.1969), and United States v. Stewart, Cr. No. 42821 (N.D. Calif.1969). · The latter case was limited to registrant's holding student undergraduate deferments.
The United States Supreme Court has agreed to hear Breen, 394 U.S. 997, 89 S.Ct. 1592, 22 L.Ed.2d 774, Gutknecht, 394 U.S. 997, 89 S.Ct. 1595, 22 L.Ed. 2d 774, Kolden and Eisdorfer. See 38 U.S.L.W. 3102 (9–30–69).

If a divinity student (IV–D) drops out of school or takes a temporary leave he has a duty under Reg. 1641.7(a) to inform the local board of his change in status. A student holding a II–S is under the same obligation. In both cases the "effect on the functioning of the system" is the same. The difference between a IV–D *exemption* and a II–S *deferment* is irrelevant.

Beyond the analogy of IV–D and II–S the whole concept relied on by the *Anderson* majority that an exempt person is "predetermined to be outside the system" is a faulty concept. For example, even persons who are exempt from registration under 50 U.S.C.App. § 456(a) and Reg. 1611.2 are still within the system. They are subject to regulation 1611.3 which provides that when a change in status occurs persons covered by 1611.2 shall register with their local board. Reg. 1611.7 makes every such person responsible for performing the requirements of registration. Consequently, if such a person violates Reg. 1611.7 he is subject to the delinquency provisions and prior to *Oestereich* could have been inducted as a I–A delinquent. It is difficult to see how such an "exempt" person is predetermined to be outside the system. Even though he is exempted from the initial act of registration he is still bound by the Selective Service regulations just as "deferred" persons are so bound. His failure to follow such regulations are as disruptive as a deferred person's failure to follow those regulations.

Having rejected the outside the system versus inside the system dichotomy, this court finds that a deferred person stands in the same shoes with regard to the delinquency reclassification provisions as does an exempted person. This conclusion was foreshadowed by Mr. Justice Stewart's statement in *Oestereich* that although "[t]his Court seems to limit its holding to statutory 'exemptions'; yet 'deferments' may just as 'plainly' preclude a registrant's induction." *Supra,*

393 U.S. at 249, n. 9, 89 S.Ct. at 423. Given this substantial similarity between deferments and exemptions there is no reason to limit *Oestereich,* and this case should be considered within the scope of that opinion.

In a different situation the court might refuse to consider the other issues presented by the delinquency scheme. However, due to the discrepancy between the circuits, and the crucial nature of these questions it feels compelled to deal with at least two of the fundamental ones: (1) Is there any legislative authorization for the challenged use of the delinquency provisions; (2) Are there definite standards guiding the use of the delinquency reclassification scheme so as to satisfy due process. Before moving specifically to these issues, it might be helpful to put the delinquency provisions into their general framework.

The first modern use of the delinquency regulations to reclassify persons and subject them to priority induction was in 1965 when two students were reclassified I–A after taking part in a demonstration at a local Selective Service board. See Wolff v. Selective Service Local Board No. 16, 372 F.2d 817 (2d Cir. 1967). The basis of their reclassification was that they had "interfered with the administration of Selective Service Board No. 85." The court held that such a procedure by the Board was unlawful because there was "no regulation authorizing a draft board to declare a registrant a delinquent or to reclassify him for such actions." (Id., at 821).

In October 1967 throughout the country demonstrations and draft card burnings were taking place as part of "Stop the Draft Week." The now "celebrated Hershey directive" of October 24 and 26, 1967 grew out of this politically charged atmosphere. See e. g., National Student Association v. Hershey, 412 F.2d 1103 (2d Cir. 1969). That directive, which was actually a letter and a Local Board memorandum addressed to all members of the Selective Service

System,[3] is the basis for the reclassification of defendant herein.

The directive was criticized as using "induction as punishment"[4] and putting "the brand of a criminal statute upon the draft laws."[5] General Hershey responded that he was not attempting to "suppress lawful dissent" but only "to stop illegal activity."[6] It is highly questionable whether the classification system can be used to stop "illegal activity;" especially when often the activity is not clearly illegal, nor does it clearly interfere with the administration of the Selective Service system.

It is historically true that in 18th century England conscription was used as punishment for "Rogues, Vagabonds & Sturdy Beggars,"[7] but in the United States military service has been considered by the Congress and the Courts as the obligation of a free citizen not as punishment. *Supra*, Sel.Serv. Act § 451 (c); See Selective Draft Law Cases, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349 (1918).

General Hershey did not refute the charge that delinquency regulations were punitive in nature. In fact, even the *Anderson* majority which upheld such regulations said that "[l]ocal Board Memorandum No. 85 could be said to indicate a punitive purpose underlying the delinquency regulations." Anderson v. Hershey, *supra*, 410 F.2d at 499 n. 17. Keeping such punitive nature in mind, along with the general policy of conscription in America we move to a con-

3. The court in National Student Association v. Hershey described the directive thusly:

In essence, the letter asserts that since "any action" violative of the Selective Service Act, regulations, or "related processes" is patently contrary to the national interest, registrants who commit such actions "should be denied deferment in the national interest." In addition, it condemns "illegal activity which interferes with recruiting or causes refusal of [military] duty" as "not by any stretch of the imagination" compatible with the national interest. It goes on to declare that

Demonstrations, when they become illegal, have produced and will continue to produce much evidence that relates to the basis for reclassification and, in some instances, even to violation of the act and regulations. Any material of this nature received in national headquarters or any other segment of the system should be sent to state directors for forwarding to appropriate local boards for their consideration.

· A local board, upon receipt of this information, may reopen the classification of the registrant, classify him anew, and if evidence of violation of the act and regulations is established * * *, also * * * declare the registrant to be a delinquent and * * * process him accordingly. This should include all registrants with remaining liability up to 35 years of age.

The text of the Memorandum is as follows:

Whenever a local board receives an abandoned or mutilated registration certificate or current notice of classification which had been issued to one of its own registrants, the following action is recommended:

(A) Declare the registrant to be delinquent for failure to have a card in his possession.

(B) Reclassify the registrant into a class available for service as a delinquent.

(C) At the expiration of the time for taking an appeal, if no appeal has been taken, and the delinquency has not been removed, order the registrant to report for induction or for civilian work in lieu of induction if in Class I–O, as a delinquent, or if in the board's discretion in a flagrant case, report him to the United States Attorney for prosecution.

4. Letter from President Kingman Brewster of Yale University to President Johnson, Dec. 21, 1967.

5. Washington Post, Nov. 11, 1967.

6. N. Y. Times, Dec. 12, 1967, at 16, col. 1.

7. 2 & 3 Anne, c. 6, sec. 16. *See* J. Griffiths, Punitive Reclassification of Registrants Who Turn in Their Draft Cards, 1 Selective Service Law Reporter 4001 (1968).

sideration of the questions of proper legislative authorization and definite standards.

The only place Congress recognizes the concept of delinquency in the Selective Service Act is in the last sentence of sec. 6(h) (1), 50 U.S.C.App. § 456(h) (1): "As used in this subsection, the term 'prime age group' means the age group which has been designated by the President as the age group from which selections for induction into the Armed Forces are first to be made after delinquents and volunteers." Judge Peckham in United States v. Stewart, 306 F.Supp. 29, N.D.Calif., June 25, 1969, and Judge Feinberg dissenting in Breen v. Selective Service Local Board No. 16, Bridgeport, Conn., 406 F.2d 636, 642 (2d Cir. 1969), characterized this as the "fleeting reference * * * which the government would escalate into a *carte blanche* grant of administrative power." They point out that a similar argument was unsuccessfully urged by the government in *Oestereich*. In contrast to these decisions, the court in *Anderson* relies, somewhat reluctantly, on the same reference: "[t]his seems to us to be a Congressional imprimatur, albeit an abbreviated one, on the delinquency procedures established by regulation." (*Supra,* 410 F.2d at 497).

The question before this court is not whether in 1967 Congress had in some vague and abbreviated way recognized the nineteen delinquency regulations already existing. Rather, it is whether Congress authorized the use of delinquency regulations 1642.4, 1642.12 and 1642.13 to reclassify persons without regard to that person's qualifications for service.

In sec. 1 of the Selective Service Act, 50 U.S.C.App. § 451, Congress states as its "Policy and intent" that there shall be "a system of selection which is fair and just, and which is consistent with the maintenance of an effective national economy." Part and parcel of this system of selection is the idea of deferments and exemptions which protect the national economy as well as allowing Americans to be secure in the knowledge that their specific qualifications are taken into account. Classification is the key to this selection process [Reg. 1622.1 (b)] and has been described by Mr. Justice Harlan as a "highly individualized process." *Oestereich, supra,* 393 U.S. at 240, 89 S.Ct. 414. The Act itself states that no occupational or dependency deferments shall be made except "upon the basis of the status of (the) individual." 50 U.S.C.App. § 456(h) (2). Whether a person has a divinity student exemption or graduate student deferment, a Public Health Service clerk exemption or a teaching deferment, the status of the individual is dependent on his personal qualities and their relation to the classification requirements set up by Congress and reflected in Regulations 1622.1–1622.50.

Congress has explicitly authorized this reasonable and theoretically fair system of determining "who serves when not all serve." Upon this system the Hershey directive attempted to graft the delinquency reclassification system. The result is an unhealthy one and the unauthorized grafting of a punitive reclassification scheme must be rejected.

Assuming one finds Congressional authorization for the use of delinquency as a sole basis of reclassification the issue which then arises is whether Congress has provided sufficiently definite standards to guide the Selective Service in the use of those delinquency regulations. This issue was not discussed by the *Anderson* or *Breen* majorities. Indeed, the court in *Breen* was careful to point out that it had not decided the standards question: "We do not intimate that * * his Fifth Amendment rights to adequate standards and notice, are not substantial." (*Supra,* 406 F.2d at 639.)

The standards question was thoroughly and persuasively argued by Judge Dooling in United States v. Eisdorfer, supra, 299 F.Supp. at 988–989. His argument

is substantiated by the regulations themselves. The delinquency regulations allow the reclassification of one who has failed to perform *"any* duty or duties required of him under selective service law * * *" (Reg. 1642.4). A quick perusal of the regulations shows the breadth of this duty.[8]

Clearly, some of these regulations are more important to the efficient functioning of the system than others. But there are no degrees of delinquency stated. There are no standards by which a person could determine if his failure to perform some duty will lead to priority induction as a I–A delinquent.

Discretion of the local boards is almost unbounded. They have discretion to interpret vague regulations such as 1617.1, (must have registration certificate in one's personal possession *at all times*). Yet there are no standards for interpretation. They have the important discretion to remove a person from delinquency status "at any time." (Reg. 1642.4(c). Yet there are no standards for removal. Neither are there standards to determine the registrant's culpability. Whether it be negligent, reckless, malicious, or disobedience based on conscience is left to the undefined workings of the particular local board.

■ One would think that in such a socially and politically important area as conscription the rules of substantive and procedural due process would be strict. But here the spectre of delegation running riot is a real one. It has long been held that when Congress delegates a power to an agency the statute delegating such authority must contain limitations and standards governing the exercise of that power. Here, the court can find no standards whatsoever, consequently the delinquency reclassification regulations must fall as an improper delegation of legislative power.

Based on the findings of law and fact above, the Board did not have the power it attempted to exercise in ordering defendant to report for induction as a I–A delinquent. (United States v. Eisdorfer, *supra*); Cf. Oestereich v. Selective Service System Local Board No. 11, Cheyenne, Wyo., *supra,* 393 at 233, 89 S. Ct. 414.

■ The government makes a brief argument that defendant knowingly abandoned a possible administrative appeal of his I–A delinquent classification and therefore he cannot raise the illegality of the Board's actions as a defense to his criminal prosecution. The argument of exhaustion is not relevant to a case such as this where the issue is the legality of the Board's action and not the quantum of evidence necessary to sustain a Board's decision. See, United States v. Pence, 410 F.2d 557 (8th Cir. 1969); *Cf. Oestereich, supra*, 393 U.S. 238 n. 7, 89 S.Ct. 414 (1968). The objection raised by the defendant is not addressed to the area of administrative judgment; rather it is attacking the constitutionality of the Board's action. In such a situation the reasons for the exhaustion doctrine disappear. (Wills v. United States, 384 F.2d 943 (9th Cir. 1967); United States v. Stewart, *supra*. *Cf.* Clark v. Gabriel, 393 U.S. 256, 258, 89 S.Ct. 424, 21 L.E.2d 418 (1968).

The motion for judgment of acquittal is granted.

8. Reg. 1611.3 (Duty to register after change in status); § 1611.7 (Duty to submit to registration is a continuing one; duty to register in whatever area one happens to be); § 1617.10 (Duty of Registrant separated from active duty to request within 10 days a duplicate registration card); § 1617.13 (Duty to return previously issued registration certificate); § 1621.10 (Duty to return classification questionnaire within *specified* time); § 1641.3 (Duty to keep local board advised at all times of mailing address); § 1641.7 (Duty to keep board informed of every change in status); § 1690.10 (Duty of reservists to furnish information of his current status).