**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Jeffery Robert WACHTEL, Defendant.**

**Crim. No. 43123.**

United States District Court,
N. D. California.

Nov. 25, 1969.

Cecil F. Poole, U. S. Atty., Coleman Bresee, Asst. U. S. Atty., San Francisco, Cal., for plaintiff.

American Civil Liberties Union of Northern California, Paul N. Halvonik and Charles C. Marson, San Francisco, Cal., for defendant.

## ORDER GRANTING MOTION FOR JUDGMENT OF ACQUITTAL

WOLLENBERG, District Judge.

### I

Prior to June, 1967, Jeffery Wachtel, as a full-time student at an institution of higher learning, enjoyed the benefits of a II–S deferment from training and service under the Selective Service Act (50 U.S.C.App. § 451 ff). In April of that year, however, Wachtel wrote his local draft board that he could "no longer conscientiously cooperate with an unequable Selective Service System which perpetrates a war that is contrary to the best interests of my country". Subsequently he filed for conscientious objector status, and disclaimed any desire for a further II–S deferment, though he continued, at least until late October, as a full-time student.

On October 10, 1967, Wachtel announced that he could no longer carry a draft card in good conscience, and that he would turn it in to the United States Marshal in San Francisco. This was done six days later. The local board on November 20 declared the registrant delinquent, classified him I–A, and after he had exhausted his appeal rights, ordered him to report for induction as delinquent. It is this use of the delinquency regulations which is now before the court.

### II

The only statutory mention of the concept of "delinquency" is in 50 U.S.C. App. § 456(h) (1): "As used in this subsection, the term 'prime age group' means the age group which has been designated by the President as the age group from which selections for induction into the Armed Forces are first to be made *after delinquents* and volunteers". (Emphasis added.) Upon this rather shallow foundation has been grounded a body of regulations which gives local draft boards almost unlimited discretion to define delinquency, to determine what shall "cure" a delinquency, and, finally, to make delinquents subject to priority induction without regard to the actual seriousness of their violations of the Selective Service laws and/or regulations. That this "discretion" can become "lawlessness" [1] has been of late recognized by the courts, which are now attempting to confine in a meaningful way local board power under the delinquency regulations. The approaches taken by the various federal courts have varied greatly, and many of the lower court decisions cited below are now under consideration by the Supreme Court [2] whose decision in Oestereich v. Selective Service System Board No. 11, Cheyenne, Wyo. [3] is far from conclusive of the issues raised by the delinquency regulations. This court thus has no alternative but to sift for itself the various approaches thus far taken, hopefully screening out that which is relevant to all cases as well as to our own, and eliminating that which is not.

Among the more significant judicial analyses of the delinquency regulations are the following:

a. The regulations cannot be used so as to conflict with statutory law. 50 U.S.C.App. § 456(g) specifies that students preparing for the ministry "shall be exempt from training and service (but not from registration) under this title". This is the narrow holding of *Oestereich:* that the intent of Con-

---

1. A term applied by the Supreme Court to use of the delinquency regulations to reclassify as I–A a registrant who otherwise enjoyed a statutory exemption as a student for the ministry. Oestereich v. Selective Service System Board No. 11,

Cheyenne, Wyo., 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968).

2. See 38 U.S.L.W. 3102.

3. *Cit. supra* note 1.

gress was that ministerial students should enjoy a mandatory statutory exemption, and that this could not be taken from them "because of conduct * * * unrelated to the merits of granting or continuing [the exemption]". The maxim that statutory commands should prevail over administrative regulations is, of course, unexceptionable, and many courts have extended *Oestereich,* so as to prevent local boards from depriving persons eligible for II–S student deferments of that status by means of the delinquency regulations.[4] The holdings of Oestereich, Kimball, etc. do not, however, help defendant herein. Since II–S status depends not only upon one's being a full time student, but also upon a request for such status,[5] and since defendant Wachtel specifically declined to make such a request, he was not, at the time the board classified him I–A delinquent, eligible for a mandatory statutory II–S deferment. To save defendant, a broader view of *Oestereich* must be taken, a view which encompasses the other approaches taken by the federal courts.

■ b. The regulations cannot be used for goals unauthorized by statute.

Thus a person enjoying a II–S deferment cannot be reclassified I–A for having taken part in a demonstration against the war in Vietnam, even though the government claims that the demonstration "knowingly hinder[s] * * * by force or violence or otherwise" the administration of the Selective Service System.[6] This use of "authorization" language may well have been the court's method of avoiding other, more significant, constitutional questions[7], and others would use the concept in a more traditional way, saying that while Congress' reference to priority call-up for "delinquents" implies some recognition of the delinquency regulations which predated the enactment of 50 U.S.C.App. § 456(h) (1), it does not authorize the use of the delinquency regulations "to reclassify persons without regard to * * qualifications for service".[8] Since no showing has been made by defendant in this case that he was actually put in a class other than that which he was qualified for quite independently of his delinquency, the "authorization" cases decided thus far are not decisive of his situation.

4. See Kimball v. Selective Service Local Board No. 15, New York, N. Y., D.C., 283 F.Supp. 606 (D.C.1968) ; United States v. Stewart, 306 F.Supp. 29 (N.D.Calif. 1969). But see Breen v. Selective Service Local Bd. No. 16, Bridgeport, Conn., 2 Cir., 406 F.2d 636 (1969), which cites 50 U.S.C.App. § 456(h) (1) to show that, unlike ministerial exemptions, student deferments are granted by the President "under such rules and regulations as he may prescribe". The *Breen* court would say that this clause allows a deferment to be denied for any reason, including delinquency; others would say that the "rules and regulations" must be subordinated to the overall policy of the statute which is to grant deferments to certain categories of registrants who request them.

5. Some courts have implied that student status is the *only* requirement for granting a II–S deferment: "[Deferments and exemptions exist in the public interest and not primarily as individual privileges]". United States v. Eisdorfer, D.C., 299 F. Supp. 975, 988. Other courts have cited

the Regulations which specify that II–S deferments shall be granted "any registrant *who has requested such* deferment and who is satisfactorily pursuing a full-time course of instruction. * * *" and have found that II–S deferments can be given only if the registrant concerned requests one. Turley v. Selective Service System, D.C., 301 F.Supp. 845 (1969).

6. Wolff v. Selective Service Local Bd. No. 16, 2 Cir., 372 F.2d 817 (1967).

7. As was certainly the case in *Oestereich, cit. supra* note 1. "We can find no *authorization* for that use of delinquency. Even if Congress had authorized the Boards to revoke statutory exemptions by means of delinquency classifications, *serious questions would arise* if Congress were silent and did not prescribe standards to govern the Boards' * * *." *Id.* 393 U.S. at 237, 89 S.Ct. at 416 (emphasis added).

8. See, for example, United States v. Mallory, 305 F.Supp. 915 (N.D.Calif. Nov. 3, 1969).

c. The regulations cannot be used for illegal ends. This language may seem but a re-expression of the concepts behind the "authorization" and "statutory conflict" cases, but it seems most applicable when the delinquency regulations are used to penalize a person for his religion, race, or political views. Defendant here has made no showing that he was singled out for his attitudes on the war in Vietnam, rather than for his *act* of turning in, and refusing to carry, a draft card. It is, however, noteworthy that nearly all the courts cited herein have mentioned the danger that the regulations may lead to "conduct of a local board that is basically lawless".[9] This is the unadmitted ground of many a decision which seems to turn on more technical considerations.

d. The entire delinquency scheme fails to satisfy due process standards of specificity and must therefore be declared void. The very confusion of theories and findings now being expounded by the courts shows how "the local boards are compelled to act on their own uncircumscribed responsibility without the guidance of settled standards in a regime of conscientious anomie".[10] The statute refers fleetingly to "delinquents", does not define what they are, how they may redeem themselves, or the relation that sanctions should have to the willfulness or seriousness of their actions. This court, however, is reluctant to declare all uses of the delinquency concept void, and feels that the regulations may yet be interpreted so as to allow priority induction of those delinquents whose conduct has made this sanction reasonable, while barring it for others whose violations are better handled in other ways.

### III

The cases are, then, many and conflicting, with no single fact situation "on all fours" with its predecessors. One common issue is framed by nearly all the courts which have been faced with the validity of the delinquency regulations: whether a particular application of them has, or has not, been consistent with the all-important national goals set forth in the Selective Service Act of 1967. The overall end of the Act is the "fullest possible utilization of the Nation's technological, scientific, and other critical manpower resources".[11] The Act and the regulations set up an elaborate system of exemptions, deferments and classifications, all of which are used to determine which individuals are to serve the national defense interest in what manner. Ministers are to be treated differently than students, who in turn are in a different category than are farm workers. Each person is to be classified according to his talents, his disabilities, and even his feelings with regard to the use of armed force to resolve international conflicts. All of this represents an effort to insure "a system of selection which is fair and just, and which is consistent with the maintenance of an effective national economy".[12]

Upon this eminently rational system are imposed the efforts of at least certain local boards to classify individuals not on the basis of their physical or mental suitability for induction, or their possible value in certain civilian lines of endeavor, but on the basis of their alleged violations of certain provisions of the draft laws. The case at hand is typical. Defendant refused to carry a draft card and for this refusal was classified I–A delinquent. At the time of the classification, the local board had before it defendant's application for conscientious objector status,[13] also, so far

---

9. Oestereich v. Selective Service System Bd. No. 11, Cheyenne, Wyo., *cit. supra* note 1.

10. United States v. Eisdorfer, D.C., 299 F.Supp. 975, 984 (1969).

11. 50 U.S.C.App. § 451(e).

12. 50 U.S.C.App. § 451(c).

13. It is to be noted that defendant's selective service file gives no indication that

as it knew at the time, defendant continued as a full time student and could have been entitled to a I–S deferment.[14] But the board did not consider defendant's status, or his suitability for immediate induction (and classification as a I–A delinquent "is, in substance, a preinduction notice"[15]); rather it classified him I–A *because he turned in his draft card.* This is not only on its face contrary to the system of classification by reference to actual status, but it runs counter to the fundamental rationale of *Oestereich*, which repeatedly emphasized that the delinquency regulations could not be used to classify a registrant "without any regard to the exemptions provided by law. * * * for conduct unrelated to the merit[s] [without any]

exercise of discretion by a Board in evaluating evidence. * * * " The question is not whether the delinquency regulations were used to "take away" a statutorily guaranteed exemption or deferment, or even whether or not the registrant might have qualified for other than I–A status had his classification been decided independently of the delinquency[16]. The question is rather if the Board classified a person without reference to the criteria established by Congress for such classification: i. e. the registrant's actual status and suitability for service.

This court does not say that under certain circumstances a declaration of delinquency coupled with priority call-up may not be justified. The statute en-

---

the board, prior to its induction order, ever considered whether registrant's claim to be a conscientious objector was well founded and justified ordering him to report for civilian work in lieu of induction. Local Board Memorandum #85, which outlines the procedures to be followed in declaring delinquent registrants who refuse to carry draft cards, specifies that this alternative is to be considered for persons who have claimed I–O status:

"2. Whenever a local board receives an abandoned or mutilated Registration Certificate * * * the following action is recommended:

" * * * order the registrant to report for induction or for civilian work in lieu of induction if in Class I–O, as a delinquent. * * * "

14. The possible availability of a I–S deferment was the decisive point in Turley v. Selective Service System, Local Board No. 134, *cit. supra* note 5, which deals with a case as close to the instant one as will ever be: Turley had been the recipient of a I–SH deferment as a high school student. Shortly after enrolling in college, he wrote his draft board that he had turned in his selective service card and that the system "no longer will wield any control whatsoever upon me". Reclassified delinquent I–A, he argued that *Oestereich* should be extended to his situation, since he had a right to a II–S deferment. The court denied that he had any such right, saying that he had failed to request the deferment, but acquitted him nonetheless, finding that he was entitled to a I–S deferment. The latter deferment does not require a formal re-

quest by the registrant, and the court thereupon concluded that there was a "clear statutory mandate precluding any exercise of discretion by the Board". *Id.,* 301 F.Supp. at 853. The fact that at the time of the court's decision defendant was no longer qualified for a I–S deferment *was not relevant. It is to be noted that* at the time (November 20) defendant in the instant case was classified I–A delinquent, he was still considered by the Board to be a full-time student, and the Board thus could have found him I–S, I–A, or a conscientious objector. The effort made by the *Turley* court to find a specific mandatory deferment to which the defendant was entitled seems less in point than the fact that the Board there, as the Board here, classified the registrant not on the basis of his actual status but on the basis of conduct unrelated to his fitness for the classification given. Note however the approach taken in United States v. Gutknecht, 8 Cir., 406 F.2d 494 (1969).

15. Wills v. United States, 9 Cir., 384 F.2d 943, 945 (1967) (a pre-Oestereich case upholding reclassification as I–A under the delinquency regulations of a holder of a II–S deferment.

16. See note 14, *supra.* It is, after all, not the function of the courts to determine what classification should have been granted an individual or to what exemption or deferment he was entitled. The courts need only ask if the Board classified according to the criteria imposed by statute.

visions such situations. If a man has for several years avoided induction because his local board relied upon fraudulent reports of status, a Board might conclude that the delinquency regulations provide a suitable means of preventing him from enjoying the fruits of his wrongdoing. Upon discovery of the fraud, and upon finding the registrant eligible by reference to his actual status for I–A classification, the Board might well order him to the top of the call-up list as a "delinquent" whose conduct has resulted in his avoiding induction at the proper time.

But this is not the case here. Defendant refused to carry his draft card. However this may have hindered the administration of the selective service system, it was not a delinquency which affected his status or the classification to which he was suited. Nor was it an attempt to avoid induction at the proper time. The classification system is established by a carefully worded, complex statute as a means of determining the actual suitability for service of given individuals. To use this system as a means of punishing violations of the myriad provisions of the Act and regulations runs counter to the overall goal of the statute, which is to attain "the fullest possible utilization of the Nation's technological, scientific and other critical manpower resources".[17] This analysis would seem to embrace all the variants cited above: use of the regulations to classify without regard to actual status is not authorized by statute, conflicts with the classification system set up by the statute, and, since it allows

the local boards to act quite without reference to the registrant's actual qualifications, it inevitably leads to an unbridled discretion which is at the very least constitutionally suspect.

Accordingly, defendant's motion for judgment of acquittal is hereby granted.

---

17. Significant indeed is the wording of Local Board Memorandum #85 and a letter sent to all boards by the Director of the Selective Service System. These documents, promulgated in October, 1967, were quite likely the motivating force behind the board action reviewed herein. They make it clear that abandonment or mutilation of a draft card should result in the wrongdoer's being reclassified "into a class available for service as a delinquent". No mention is made of the fact that many delinquents would be far from

valuable additions to the service under the criteria established by the statute. In fact, the Director's letter appears to encourage efforts to reclassify and induct even the physically and mentally unfit: "Registrants presently in classes IV–F or I–Y who have already been reported for delinquency, if they are found still to be delinquent, should again be ordered to report for physical examination to ascertain whether they may be acceptable in light of current circumstances."