The Reverend Henry Hale BUCHER, Jr.,
et al., Appellants,

v.

SELECTIVE SERVICE SYSTEM, LOCAL
BOARDS NOS. 2, ETC. and Colonel
Joseph Avella, etc.

No. 17414.

United States Court of Appeals
Third Circuit.

Argued June 3, 1969.

Decided Jan. 2, 1970.

Rehearing Denied Feb. 12, 1970.

Marvin M. Karpatkin, Karpatkin, Ohrenstein & Karpatkin, New York City, (Emerson Darnell, Mount Holly, N. J., Morton Stavis, Dennis J. Roberts, Harriet Van Tassel, Newark, N. J., Robert Layton, Melvin L. Wulf, American Civil Liberties Union, Michael N. Pollet, New York City, on the brief), for appellants.

William D. Ruckelshaus, Asst. Atty. Gen., Dept. of Justice-Civil Division, Washington, D. C. (David M. Satz, Jr., U. S. Atty., Morton Hollander, David J. Anderson, Attys., Dept. of Justice, Washington, D. C., on the brief), for appellees.

Before KALODNER, VAN DUSEN and STAHL, Circuit Judges.

## OPINION OF THE COURT

KALODNER, Circuit Judge.

When the appellants, in symbolic protest against the involvement of the United States in the Vietnam War, turned in their draft Registration Notices and/or Notices of Classification to their local

draft boards,[1] the latter stripped them of their existing exempt or deferred status and reclassified them I-A delinquent, highest order of priority for induction, pursuant to the provisions of the Selective Service Regulations[2] and Local Board Memorandum No. 85, issued by General Lewis B. Hershey, Director of the Selective Service System.[3]

The draft status of the respective appellants prior to their I-A delinquency reclassification was as follows:

IV-D (ministerial exemption)— Bucher, Behm and Caldwell.

II-S (student deferment)—Podbereski.

II-A (essential occupational deferment)—Marcus and Ostroff.

III-A (dependency and hardship deferment)—Matlack, Thorburn and De-Ricco.

IV-F (permanently unqualified for any military service)—Klinefelter.

I-Y (temporarily unqualified)—Pailet, Robertson, Wyman, Jr. and Bobo.

Subsequent to their I-A delinquency reclassifications, the appellants filed a Complaint[4] in the court below[5] against their respective draft boards seeking (1) a declaratory judgment adjudicating the Selective Service delinquency regulations and the Hershey Directive to be "void on their face and/or as applied violative of the Constitution of the United States", and (2) a preliminary and permanent injunction restraining the defendants from

1. Some of the draft cards were turned in to the Attorney General of the United States.

2. Selective Service Regulations ("Regulations") require that a draft registrant must have his Registration Certificate "in his personal possession at all times," 32 C.F.R. § 1617.1, and that a registrant who has been classified must do likewise with his Notice of Classification, 32 C.F.R. § 1623.5.

   The Regulations authorize a local draft board to reclassify as a delinquent any registrant who "has failed to perform any duty or duties required of him under the selective service law. * * *" 32 C.F.R. § 1642.4(a), and "delinquents" are placed in the highest order of priority for induction. 32 C.F.R. § 1631.7.

3. Local Board Memorandum No. 85, issued October 24, 1967, generally referred to as the "Hershey Directive", advises all draft boards to reclassify as "delinquents" all registrants who have "abandoned or mutilated" their Registration Certificate or current Notice of Classification.

   The Hershey Directive states in relevant part:

   "Whenever a local board receives an abandoned or mutilated Registration Certificate or Current Notice of Classification which had been issued to one of its own registrants, the following action is recommended:

   (a) Declare the registrant to be delinquent for failure to have the card in his possession.

   (b) Reclassify the registrant into a class available for service as a delinquent.

   (c) At the expiration of the time for taking an appeal, if no appeal has been taken, and the delinquency has not been removed, order the registrant to report for induction or for civilian work in lieu of induction if in Class I-O, as a delinquent, or in the board's discretion in a flagrant case, report him to the United States Attorney for prosecution."

   The Regulations enumerating the powers of the National Director of Selective Service, 32 C.F.R. 1604.1, provide in relevant part:

   "The Director of Selective Service is hereby authorized and directed:

   (a) To prescribe such rules and regulations as he shall deem necessary for the administration of the Selective Service System. * * *

   (b) To issue such public notices, orders, and instructions as shall be necessary for carrying out the functions of the Selective Service System.

   *       *       *       *       *

   (f) To perform such other duties as shall be required of him under the selective service law or which may be delegated to him by the President."

4. The Complaint was filed by Rev. Bucher and thrice amended to include the other appellants.

5. United States District Court for the District of New Jersey. All of the appellants are residents of the State of New Jersey and the defendant draft boards are located in that State.

giving effect to the I–A delinquency reclassifications.[6]

The court below denied defendants' motion to dismiss the Complaint and further denied appellants' motion for a preliminary injunction "with prejudice", on its holding that (1) "Plaintiffs will not suffer irreparable injury if no preliminary injunction is granted"; (2) "Operation of the Selective Service System in New Jersey will be seriously hindered by the granting of a preliminary injunction in this action"; and (3) "Plaintiffs have an adequate remedy at law."

On the score of the foregoing, the parties have, on this appeal, stipulated that we "treat the appeal in all respects as if it is an appeal from a final judgment, rather than an appeal from the denial of a preliminary injunction."

The distilled essence of plaintiffs' position is that their I–A delinquency reclassifications constituted impermissible "punitive" action contravening First Amendment rights and due process guarantees.

Defendants dispute plaintiffs' contentions. They further challenge the jurisdiction of a federal court to entertain the instant action on the assigned ground that pre-induction judicial review of I–A delinquency reclassifications is prohibited by Section 10(b) (3) of the Military Selective Service Act of 1967 ("Act").[7] That section provides in relevant part:

"* * * No judicial review shall be made of the classification or processing of any registrant by local boards, appeal boards, or the President, except as a defense to a criminal prosecution * * * after the registrant has responded either affirmatively or negatively to an order to report for induction * * *."

We give no sanction to defendants' interposition of Section 10(b) (3) for this reason:

▆▆▆ Section 10(b) (3) does not bar pre-induction judicial review where, as here, the validity of the Selective Service System's delinquency reclassification procedures is challenged on the grounds that they lack statutory authorization, and/or violate constitutional rights. The Section bars pre-induction judicial review only where there is a challenge to the System's resolution of factual questions in the classification or processing of a draft registrant. There is here no such challenge.

Our construction of the sweep of Section 10(b) (3) is in harmony with that of Mr. Justice Harlan in his concurring opinion in Oestereich v. Selective Service System Local Board No. 11, Cheyenne, Wyo., 393 U.S. 233, 239–245, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968).[8] There the majority confined its consideration of the Section to the narrow point whether it barred preinduction judicial review of delinquency reclassification of registrants previously accorded IV–D (ministerial exemption) classifications. The Court ruled that the Act[9] granted a "plain and unequivocal exemption" to ministers and ministerial students, and Section 10(b) (3) could not be construed to impair the statutory mandate as to such exemption.

In his concurring opinion in *Oestereich*, Mr. Justice Harlan said 393 U.S. at pages 239–240, 89 S.Ct. at page 417–418:

"I concur in the holding that pre-induction review is available in this case, but I reach this conclusion by means of a somewhat different analysis from

---

6. All of the appellants, except Rev. Bucher, have received orders to report for induction since the commencement of the instant action but the orders have been stayed informally by the New Jersey Selective Service Headquarters pending final disposition of this appeal.

7. 50 U.S.C.A. App. § 460(b) (3).

8. Our construction of Section 10(b) (3) is also in accord with that of the Court of Appeals for the District of Columbia in National Student Association, Inc. v. Hershey, 412 F.2d 1103, 1107–1110 (D.C. Cir. 1969).

9. 50 U.S.C.A. App. § 456(g).

that contained in the opinion of my Brother DOUGLAS.

"At the outset, I think it is important to state what this case does and does not involve. Petitioner does not contend that the Selective Service System has improperly resolved factual questions, or wrongfully exercised its discretion, or even that it has acted without any 'basis in fact,' as that phrase is commonly used in this area of law. See Estep v. United States, 327 U.S. 114, 122–123, 66 S.Ct. 423, 90 L.Ed. 567 (1946); *ante*, 393 U.S. at 238 n. 7, 89 S.Ct. at 417. He asserts, rather, that the procedure pursuant to which he was reclassified and ordered to report for induction—a procedure plainly mandated by the System's self-promulgated published regulations, 32 CFR, pt. 1642—is unlawful. Specifically, he asserts that the delinquency reclassification scheme is not authorized by any statute, that it is inconsistent with his statutory exemption as a ministerial student, 50 U.S.C. App. § 456(g), and that, whether or not approved by Congress, the regulations are facially unconstitutional." (footnote omitted).

*"The pivotal language of § 10(b) (3), for present purposes, is the statute's proscription of pre-induction judicial review 'of the classification or processing of any registrant * * *.'* I take the phrase 'classification or proc-essing' to encompass the numerous discretionary, factual, and mixed law-fact determinations which a Selective Service Board must make prior to issuing an order to report for induction. *I do not understand that phrase to prohibit review of a claim, such as that made here by petitioner, that the very statutes or regulations which the Board administers are facially invalid."* (emphasis supplied).

and at pages 243–244, 89 S.Ct. at page 419–420:

*"To withhold pre-induction r view in this case would, thus deprive petitioner of his liberty without the prior opportunity to present any competent forum—agency or court—his substantial claim that he was o. ered inducted pursuant to an unlawful procedure. Such an interpretation of § 10(b) (3) would raise serious constitutional problems, and is not indicated by the stat ute's history, language, or purpose. On the foregoing basis I agree that § 10(b) (3) does not forbid pre-induction review in this instance."* (footnotes omitted). (emphasis supplied).

What has been said makes unnecessary further discussion of our holding that Section 10(b) (3) is not a jurisdictional bar to our consideration and disposition of the instant appeal.[10] We are, of course, aware that Courts of Appeals in other Circuits have ruled to the contrary in the cases listed in the margin,[11] and

---

10. The Courts of Appeals of the First and Seventh Circuits have also specifically ruled that where there is a challenge to a classification on the ground that it is without statutory basis that Section 10(b) (3) does not preclude pre-induction judicial review. Bowen v. Hershey, 410 F.2d 962 (1st Cir. 1969); Crane v. Hershey, 410 F.2d 966 (1st Cir. 1969); Foley v. Hershey, 409 F.2d 827 (7th Cir. 1969).

11. Breen v. Selective Service Local Board No. 16 Bridgeport, Conn., 406 F.2d 636 (2d Cir. 1969), cert. granted, 394 U.S. 997, 89 S.Ct. 1592, 22 L.Ed.2d 775; Kraus v. Selective Service System Local 25, 408 F.2d 622 (4th Cir. 1969), petition for cert. filed, 38 U.S.L. Week 3058 (U.S. July 11, 1969) (331); Anderson v. Hershey, 410 F.2d 492, 493 (6th Cir. 1969), petition for cert. filed, 38 U.S.L. Week 3094 (U.S. Aug. 8, 1969) (449); Rich v. Hershey, 408 F.2d 944 (10 Cir. 1969).

Cf. Zigmond v. Selective Service Local Board No. 16, 396 F.2d 290 (1 Cir. 1968), petition for stay denied, 391 U.S. 930, 88 S.Ct. 1831, 20 L.Ed.2d 851, Justice Douglas dissenting.

We note, additionally, that the Government has cited Kolden v. Selective Service Local Board No. 4, Beltrami County, Minn., 406 F.2d 631 (8 Cir. 1969), petition for cert. filed, 38 U.S.L. Week 3006 (U.S. Mar. 19, 1969) (70), in support of its contention that § 10(b) (3) prohibits our pre-induction review in the instant case. There, however, the Court decided only the narrow question whether

that as there noted the Supreme Court has granted certiorari in one case but has not acted with respect to pending applications for certiorari in the others.

The foregoing disposition of the threshhold question of jurisdiction brings us to resolution of the plaintiffs' challenge to the validity of the instant I–A delinquency reclassifications.

In preface of our resolution we must immediately declare that independent of it the three IV–D (ministerial exemption) plaintiffs—Bucher, Behm and Caldwell—and the II–S (student deferment) plaintiff Podbereski, are entitled to entry of judgment in their favor for these respective reasons:

█ It was expressly ruled in *Oestereich* that a IV–D registrant is endowed with a "statutory exemption" under Section 6(g) of the Military Selective Service Act of 1967,[12] and that it was "blatantly lawless" action when his local draft board reclassified him I–A delinquent because he had turned in his draft card "for the sole purpose of expressing dissent from the participation of the United States in the war in Vietnam." [13]

█ In United States v. Worstell, 419 F.2d 762 (decided November 7, 1969), this Court held that a II–S registrant enjoys a statutory deferment on a parity with a statutory exemption, under the provisions of Section 6(h) (1) of the Military Selective Service Act of 1967,[14] and accordingly he cannot be reclassified I–A delinquent for turning in his draft card to his local draft board "in token of his opposition to the Vietnam War." [15]

Coming now to resolution of the issue of validity of the defendant draft boards' actions in stripping the remaining plaintiffs of their respective existing deferred status and reclassifying them I–A delinquent, highest order of priority for induction, for turning in their draft cards:

We are of the opinion that the I–A delinquency reclassifications are invalid for these reasons:

(1) They were imposed as summary "punishment" and constituted punitive action in violation of constitutional procedural due process guarantees, viz., the Fifth and Sixth Amendment rights of trial by jury, assistance of counsel, confrontation, compulsory process for obtaining witnesses, etc.

(2) They, and the delinquency procedures of the draft system, pursuant to which they were made, lack statutory authorization in the Military Selective Service Act of 1967.

First, as to the constitutional issue:

It is patent that the involved plaintiffs were "punished" when they were stripped of their deferred status and reclassified delinquent for turning in their draft cards in violation of the Regulations requiring them to have such cards in their "personal possession at all times." It is undisputed that the punishment was inflicted solely by summary administrative procedure, pursuant to the provisions of Regulation 1642.4(a).

Reclassifying a IV–F (permanently unqualified for any military service) registrant into I–A delinquent—highest order of priority for induction—classification, cannot conceivably be construed as other than an act of punishment; and the same is equally true with respect to similar reclassifications of I–Y (temporarily unqualified); II–A (essential occupation); and III–A (dependency and hardship) registrants.

§ 10(b) (3) barred judicial review of the delinquency reclassification of a II–S *graduate* student. In holding that it did, the Court expressly reserved decision as to the other categories of deferments.

12. 50 U.S.C.A. App. § 456(g).

13. It should be noted that in obedience to Oestereich, plaintiff Bucher was reclassified IV–D prior to oral argument of the instant appeal.

14. 50 U.S.C.A. App. § 456(h) (1).

15. See also, Stevenson v. Selective Service System Local Board No. 157, Lincoln, Illinois, 303 F.Supp. 1254 (W.D.Wisc. 1969) ; Kimball v. Selective Service Local Board No. 15, New York, New York, 283 F.Supp. 606 (S.D.N.Y.1968).

■ The Selective Service System was established by Congressional enactment to mobilize national manpower for induction into the armed forces of the United States in the shortest possible period. Falbo v. United States, 320 U.S. 549, 552, 64 S.Ct. 346, 88 L.Ed. 305 (1944).

It was *not* established to impose punishment on members of the reservoir of the national manpower who violated the draft laws or the rules and regulations promulgated as part of the regulatory scheme of the Selective Service System.

The Selective Service System has given "lip" service to the latter proposition. It did so in General Hershey's October 26, 1967 "LETTER TO ALL MEMBERS OF THE SELECTIVE SERVICE SYSTEM," which followed issuance on October 24, 1967 of his Local Board Memorandum No. 85 (The Hershey Directive).

General Hershey there stated:

"The Selective Service System has always recognized that *it was created to provide registrants for the Armed Forces, rather than to secure their punishment for disobedience of the Act and Regulations.* There occasionally will be registrants, however, *who will refuse to comply with their legal responsibilities,* or who will fail to report as ordered, or refuse to be inducted. *For these registrants, prosecution in the courts of the United States must follow with promptness and effectiveness.*" (emphasis supplied).

As earlier stated, and later developed, the delinquency regulations and procedures pursuant thereto, lack statutory authorization in the Military Selective Service Act.

■ Assuming, *arguendo*, the existence of such statutory authorization, the summary administrative punitive actions here under review, must nevertheless be held to be in contravention of procedural due process.

In Kennedy, Attorney General, v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) it was held that Acts of Congress [16] which granted a federal agency authorization to deprive, administratively, an American of his citizenship for specified violation of the draft laws were unconstitutional because they empowered the agency to inflict severe punishment without due process of law and without the safeguards which must attend a criminal prosecution under the Fifth and Sixth Amendments.

In so ruling the Supreme Court said at page 165, 83 S.Ct. at page 566:

"We hold §§ 401(j) and 349(a) (10) invalid because in them Congress has plainly employed the sanction of deprivation of nationality *as a punishment*—for the offense of leaving or remaining outside the country to evade military service—*without affording the procedural safeguards guaranteed by the Fifth and Sixth Amendments.*" (Footnote quoting 5th and 6th Amendments omitted). (emphasis supplied).

and at page 167, 83 S.Ct. at page 567:

"* * * *the Fifth and Sixth Amendments mandate that this punishment cannot be imposed without a prior criminal trial and all its incidents,* including indictment, notice, confrontation, jury trial, assistance of counsel, and compulsory process for obtaining witnesses. *If the sanction these sections impose is punishment, and it plainly is, the procedural safeguards required as incidents of a criminal prosecution are lacking.* We need go no further." (emphasis supplied).

In *Mendoza-Martinez* it was pointed out that in testing the punitive nature of a sanction, a relevant factor is "whether the behavior to which it applies is already a crime." 372 U.S. 168, 83 S.Ct. 567. On that score it must be noted that Congress in Section 12(a) of the Military Selective Service Act of 1967,[17] made criminal the knowing fail-

---

16. Section 401(j) of the Nationality Act of 1940, as amended, ch. 418, 58 Stat. 746; Section 349(a) (10) of the Immi- gration and Nationality Act of 1952, 8 U.S.C. § 1481(a) (10).

17. 50 U.S.C.A.App. § 462(a).

ure or neglect to perform any duty prescribed by the rules or regulations of the Selective Service System. Here, plaintiffs by turning in their draft cards, breached the duty to have their draft cards in their "personal possession at all times" as required by Regulations 1617.1 and/or 1623.5, and thereby brought themselves within the reach of Section 12(a).

It must be said here that while the Supreme Court in *Oestereich* did not reach the due process issue presented by the Selective Service System's delinquency procedures, since it was there unnecessary to do so, it nevertheless pointed out that " * * * Congress did not define delinquency; nor did it provide any standards for its definition by the Selective Service System", 393 U.S. 236–237, 89 S.Ct. 416, and further stated:

"Even if Congress had authorized the [local] Boards to revoke statutory exemptions by means of delinquency classifications, serious questions would arise if Congress were silent and did not prescribe standards to govern the Boards' actions." 393 U.S. 238, 89 S.Ct. 416.

It must also be said that Mr. Justice Harlan, in his concurring opinion in *Oestereich*, stated that, while it was unnecessary to decide it, the petitioner had presented the "nonfrivolous argument that induction pursuant to the delinquency reclassification procedure constitutes 'punishment' for violation of collateral regulations, without jury trial, right to counsel, and other constitutional requisites. See Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168–169, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)." 393 U.S. 244, fn. 6, 89 S.Ct. 420.

On the score of our holding that the instant delinquency reclassifications are punitive, we note that only one other court of appeals has ruled specifically on that question and reached a contrary result. Anderson v. Hershey, 410 F.2d 492, 498–499 (6 Cir. 1969), application for certiorari pending.[18] Judge Combs, dissenting, stated (p. 499):

"I am of the opinion that the delinquency regulations are punitive and for this reason invalid."

In Breen v. Selective Service Local Board No. 16, Bridgeport, Conn., 406 F.2d 636, 639 (2 Cir. 1969), cert. granted 394 U.S. 997, 89 S.Ct. 1592, 22 L.Ed.2d 775, the court expressly recognized that delinquency reclassifications present substantial questions of violation of " * * * Fifth Amendment rights to adequate standards and notice, * * * ", albeit it ruled that Section 10(b) (3) precluded their pre-induction consideration. Judge Feinberg, dissenting on the jurisdictional point, said at page 642:

"The underlying issue is whether the proper agency to 'punish' transgressions of that rule is a court, under traditional safeguards, or an unfettered draft board, consisting of 'part-time uncompensated members,' in a proceeding essentially 'non-judicial.' Oestereich v. Selective System Local Board No. 11, Cheyenne, Wyo., 393 U.S. 233, at 243, 89 S.Ct. 414, at 419, 21 L.Ed.2d 402 (Harlan, J।)."

The United States Court of Appeals for the Fourth Circuit has, also recognized that delinquency reclassifications present "substantial" constitutional questions, although, as in *Breen*, it held that Section 10(b) (3) barred their pre-induction disposition. Kraus v. Selec-

18. In another context, where the delinquency reclassifications were premised on the circumstance that Section 12(a) of the draft Act makes it a crime "to knowingly hinder, or interfere * * * with the [Act's] administration * * * " and the involved deferred registrants had participated in a "sit-in" demonstration before a local Board's office, it was held that the reclassifications were "punishment" in contravention of constitutional

rights. Wolff v. Selective Service Local Board No. 16, 372 F.2d 817 (2 Cir. 1967).

In so holding, the Court said (p. 822):
" * * * [I]t is not the function of local boards in the Selective Service System to punish these registrants by reclassifying them I–A because they protested as they did over the Government's involvement in Vietnam."

tive Service System Local 25, 408 F.2d 622, 623, 625 (1969), application for certiorari pending.

There remains this to be said with respect to the constitutional issue:

Defendants contend that the draft system's delinquency procedures are "remedial rather than punitive", and premise this contention on the stated view that "The delinquency regulations perform a vital function in insuring the orderly operation of the Selective Service System. *They render self-defeating any attempt by the registrant to cut himself off from the system and thus evade a liability for military service."* (emphasis supplied).

■ The short answer to the "remedial" contention, insofar as the plaintiffs here are concerned, is that assuming, *arguendo*, that their turning in of their draft cards constituted an attempt on their part to "cut" themselves "off from the draft system," their actions cannot by any stretch of the imagination be said to have been directed to "evade a liability for military service," in the light of their then existing deferred status.

In support of their contention that the delinquency procedures are not punitive, defendants have cited United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); Wills v. United States, 384 F.2d 943 (9 Cir. 1967), cert. den., 392 U.S. 908, 88 S.Ct. 2052, 20 L.Ed.2d 1366, and United States v. Gutknecht, 406 F.2d 494 (8 Cir. 1969), cert. granted, 394 U.S. 997, 89 S.Ct. 1595, 22 L.Ed.2d 775.

These cases are inapposite in that they all were appeals by draft registrants from convictions, *after trial,* on indictments charging commission of acts made crimes by Section 12 of the Military Selective Service Act of 1967.

In both *O'Brien* and *Wills* draft registrants had been tried and convicted on indictments charging them with having destroyed their draft cards in violation of Section 12(b) (3) [19] of the Military Selective Service Act of 1967, which makes it a crime to destroy or mutilate a registration certificate. In both cases the defendants urged that they had destroyed their draft cards in protest against United States involvement in the Vietnam War and claimed only that their conduct was protected freedom of speech under the First Amendment, and in both cases it was held that the destruction of draft cards was not protected under the First Amendment.

*Gutknecht* involved a draft registrant's appeal from his conviction on an indictment charging him with failing to comply with an order to report for induction in violation of Section 12(a) [20] of the 1967 draft act. *Gutknecht* was classified I–A at the time he turned in his draft card in protest against the Vietnam involvement. He was declared delinquent for that action by his draft board and ordered to report for induction. He contended on appeal that his turning in of his draft card was protected conduct under the First Amendment and that his delinquency classification was for that reason invalid. The Court rejected that contention, citing *O'Brien.*

We do not on this review reach the administration of the criminal provisions of Section 12 of the Military Selective Service Act of 1967. We are here concerned *only* with the issue validity of the delinquency reclassification procedures of the Selective Service System practiced pursuant to the provisions of 32 C.F.R. § 1642.4(a).

Coming now to our earlier stated holding that the delinquency reclassifications here involved, and the delinquency procedures of the Selective Service System, pursuant to which they were made, lack statutory authorization in the Military Selective Service Act of 1967, and are invalid for that separate and independent reason:

As we stated in our discussion of the constitutional issue, the Selective Ser-

---

19. 50 U.S.C.A.App. § 462(b) (3).

20. 50 U.S.C.A.App. § 462(a).

vice System was established by Congressional enactment to mobilize national manpower for induction into the armed forces in the shortest possible period, and *not* to impose punishment on members of the reservoir of the national manpower who violated the draft laws or the rules and regulations promulgated as part of the regulatory scheme of the Selective Service System. These propositions were acknowledged by General Hershey in his earlier quoted October 26, 1967 "LETTER TO ALL MEMBERS OF THE SELECTIVE SERVICE SYSTEM."

Congress has reserved to the district courts of the United States imposition of punishment upon violators of the rules and regulations of the Selective Service System.

It did so in Section 12 of the Military Selective Service Act of 1967 which made it a crime for "any person" to "knowingly fail or neglect or refuse to perform any duty required" by the Act "or rules, regulations and directions" of the Selective Service System, and provided that such persons *"upon conviction in any district court of the United States of competent jurisdiction, be punished by imprisonment for not more than five years or fine of not more than $10,000, or both such fine and imprisonment."* Section 12 further provided that *"precedence shall be given by courts to the trial of cases arising under this title."* (emphasis supplied).

█ Standing alone, this specific provision for imposition by federal courts of punishment upon those found guilty of violating the Selective Service System's rules and regulations makes it clear that Congress did not intend to vest the power of punishment in the Selective Service System.

In *Oestereich*, the Court specifically pointed to the fact that Congress had made it a crime to violate the rules and regulations of the Selective Service System in ruling that there is no legislative authority for the striking down of a ministerial exemption "because of con-

duct or activities unrelated to the merits of granting or continuing that exemption." 393 U.S. 237, 89 S.Ct. 416.

We are aware of the limited scope of the Court's ruling in *Oestereich*. However, what the Supreme Court there said in its discussion of the question of statutory authorization of the delinquency procedure affords an illuminating guide in deciding here whether there is statutory authority for the application of such procedures in the case of a registrant who has been accorded a deferred status in consonance with the provisions of the Military Selective Service Act of 1967.

In discussing the statutory authorization question presented in *Oestereich*, the Court said:

"If we assume, as we must for present purposes, that petitioner is entitled to a statutory exemption as a divinity student, by what authority can the Board withhold it or withdraw it and make him a delinquent?

"In 1967 Congress added a provision concerning the immediate service of members of a 'prime age group' after expiration of their deferment, stating that they were the first to be inducted 'after delinquents and volunteers.' 50 U.S.C.App. § 456(h) (1) (1964 ed., Supp. III). Congress has also made criminal the knowing failure or neglect to perform any duty prescribed by the rules or regulations of the Selective Service System. 50 U.S.C.App. § 462 (a) (1964 ed., Supp. III). But Congress did *not define delinquency; nor did it provide any standards for its definition by the Selective Service System.* Yet Selective Service, as we have noted, has promulgated regulations governing delinquency and uses them to deprive registrants of their statutory exemption, because of various activities and conduct and without any regard to the exemptions provided by law.

*"We can find no authorization for that use of delinquency.* Even if Congress had authorized the Boards to revoke

statutory exemptions by means of delinquency classifications, serious questions would arise if Congress were silent and did not prescribe standards to govern the Boards' actions. *There is no suggestion in the legislative history that, when Congress has granted an exemption and a registrant meets its terms and conditions, a Board can nonetheless withhold it from him for activities or conduct not material to the grant or withdrawal of the exemption. So to hold would make the Boards freewheeling agencies meting out their brand of justice in a vindictive manner.*

"Once a person registers and qualifies for a statutory exemption, *we find no legislative authority to deprive him of that exemption because of conduct or activities unrelated to the merits of granting or continuing that exemption.* The Solicitor General confesses error on the use by Selective Service of delinquency proceedings for that purpose." (footnote omitted) (emphasis supplied).

In the instant case the involved plaintiffs were reclassified I–A delinquent solely because they turned in their draft cards—a causal factor "not material to the grant or withdrawal" of their prior accorded deferred status, and "unrelated to the merits of granting or continuing" of that status.[21]

We find there is no statutory authorization for such reclassification and note on that score that defendants have not cited to us any provision in the Military Selective Service Act of 1967 authorizing such reclassification.[22] Punitive disciplinary action with respect to violators of the rules and regulations of the Selective Service System and the provisions of the Act itself, is provided for in Section 12 and that Section is exclusionary with respect to the imposition of such disciplinary action.[23]

What has been said establishes that the Selective Service System's delinquency procedures lack statutory authorization and are invalid for that reason. Regulation 1642.4(a), which authorized the Selective Service System's delinquency reclassification procedure can only be described as constitutionally impermissible "executive legislation."

Because we deem it unnecessary to our disposition, we have not reached the issue whether the II–A (essential occupation); III–A (dependency and hardship); IV–F (permanently unqualified for any military service); and I–Y (temporarily unqualified) classifications specified in Section 6(h) (2) of the Military Selective Service Act of 1967[24] achieve the dimension of statutory deferments akin to the statutory deferment status of the II–S (student) classification dealt with in *Worstell.*

Since we have reached the conclusion that the delinquency reclassifications here are invalid for the separate and independent reasons that (1) they violate the constitutional procedural due process guarantees of the Fifth and Sixth Amendments, and (2) they lack statutory authorization, we find it unnecessary to advert to the plaintiffs' contention that the reclassifications violate their First Amendment rights.

For the reasons stated the Order of the District Court will be reversed and the cause remanded with directions to proceed in accordance with this Opinion.

21. It was recently held in United States of America v. Pence, 410 F.2d 557, 562 (8 Cir. 1969) that:
"It is well settled that reclassification of a registrant must be based upon some fact not considered in granting the original classification which would justify a change in classification."

22. *Accord,* United States of America v. Eisdorfer, 299 F.Supp. 975, 987 (E.D. N.Y.1969), application for cert. filed, 396 U.S. 884, 90 S.Ct. 172, 24 L.Ed.2d 175 (U.S. July 11, 1969) (330).

23. *Accord,* Wolff v. Selective Service Local Board No. 16, 372 F.2d 817, 821–822 (2 Cir. 1967).

24. 50 U.S.C.A.App. § 456(h) (2).

VAN DUSEN, Circuit Judge (concurring in part and dissenting in part).

I respectfully dissent from that part of the majority decision holding that plaintiffs Bobo, DeRicco, Marcus, Matlack, Ostroff, Pailet, Robertson, Thorburn, and Wyman, Jr. (formerly classified I–Y, II–A or III–A) are entitled to injunctive relief at this time on this record.

Insofar as it is approved by the majority opinion, the stipulation makes clear that this case is now before the court on appeal from a District Court order (entered after hearing and filing of findings of fact and conclusions of law) denying plaintiffs a permanent injunction and entering a final judgment for defendants.[1] The most pertinent findings of the District Court are:

"3. Plaintiffs Bucher and Caldwell had previously been placed in IV–D classifications. Plaintiff Bucher has subsequently been placed back into his IV–D status where he is at present. All other plaintiffs had previously been in deferred categories.

"4. All named plaintiffs turned in their draft cards (Registration certificates or Notices of classification).

"5. All named plaintiffs were reclassified into I–A status for turning in draft cards.

"6. None of the named plaintiffs have been ordered to report for induction."[2]

The notes of testimony taken at the hearing on the application for a preliminary injunction held May 17, 1968, have never been transcribed and are not part of the record. The record now before this court presents insufficient facts on which to declare an act of Congress (Section 10(b) (3) of the Military Selective Service Act of 1967—50 U.S.C. App. § 460(b) (3)) ineffective in the cases of the above-named plaintiffs on constitutional grounds. It is entirely consistent with the brief findings of fact of the district court that the plaintiffs were not reclassified solely because they turned in their draft cards; the turning in of the draft cards may have been just one factor (a) in a history of unwillingness to comply with draft regulations found reasonable in United States v. O'Brien, 391 U.S. 367, 378, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), or (b) in a situation where the factors previous to the non-compliance described in finding No. 4 above predominated so slightly in persuading the draft board to grant a discretionary deferment that the balancing of factors justified a denial of the discretionary deferment after consideration of this noncompliance.

I believe the majority misconstrues the nature of Supreme Court precedent in holding that pre-induction review is permissible in this case because (a) the delinquency regulations are unconstitutional, and (b) they are unauthorized. Intertwined in these two holdings is the crux of the majority decision as applied to the above-named plaintiffs, namely, that § 10(b) (3) of the Military Selective Service Act of 1967, 50 U.S.C. App. § 460(b) (3) is invalid insofar as its terms bar judicial review before these registrants are accepted for induction, even though their previous classifications were based on discretionary deferments.

Prior to 1967, the law on pre-induction review was clear. As Justice Black stated in Falbo v. United States, 320 U.S. 549, 554, 64 S.Ct. 346, 348–349, 88 L.Ed. 305 (1944):

"Even if there were * * * a constitutional requirement that judicial

---

1. The application to dismiss the complaint specifically relied on the contention that the court was deprived of jurisdiction over the subject matter of this suit by the specific terms of 50 U.S.C.App. § 460(b) (3).

2. The balance of the findings of fact were:
"FINDINGS OF FACT

"1. The named plaintiffs are all Selective Service registrants.

"2. Defendants are Selective Service Local Boards in New Jersey and the New Jersey State Director of Selective Service."

The Conclusions of Law appear at page 3 of the majority opinion.

review must be available to test the validity of the decision of the local board, it is certain that Congress was not required to provide for judicial intervention before final acceptance of an individual for national service."

Following a series of decisions that appeared to weaken this well-settled rule,[3] Congress enacted § 10(b) (3), specifically abrogating the right to review a classification before final acceptance for induction.

In Oestereich v. Selective Serv. System Local Bd. No. 11, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968), the Supreme Court held that § 10(b) (3) could not have been intended to bar review of reclassification of registrants entitled to a "statutory exemption." The Court noted that Congress had sanctioned classification of registrants as "delinquents," id. at 236, 89 S.Ct. 414, but held that the "scope of the statutory delinquency concept is not broad enough to sustain a revocation of what Congress has granted as a statutory right, or sufficiently buttressed legislative standards." Id. at 238–239, 89 S.Ct. at 417. The Court repeated the requirement that the lost deferment must be one of statutory right to preclude application of § 10(b) (3) in Clark v. Gabriel, 393 U.S. 256, 89 S.Ct. 424, 21 L.Ed.2d 418 (1968). In that case, a registrant challenged the failure of his board to classify him as a conscientious objector; the District Court issued a preliminary injunction holding that the "tortuous judicial adventure" dictated by § 10(b) (3), a choice between defending against a crim-

inal prosecution for failing to submit to induction and applying for a writ of habeas corpus following induction, amounted to "no review at all." Based on the "principles enunciated" in Oestereich, the Supreme Court reversed:

"In Oestereich the delinquency procedure by which the registrant was reclassified was without statutory basis and in conflict with petitioner's rights *explicitly established by the statute and not dependent upon an act of judgment by the board.* Oestereich, as a divinity student, was by statute *unconditionally entitled to exemption.* Here, by contrast, there is no doubt of the board's statutory authority to take action which appellee challenges, and that action inescapably involves a determination of fact and an exercise of judgment." Id. at 258, 89 S.Ct. at 426. (Emphasis added.)[4] The Court held that there was no constitutional objection to the statutory provision that review of the registrant's claims be deferred until induction.

The majority correctly points out that lower federal courts are in disagreement as to which deferments "Congress has granted as a statutory right." *Oestereich, supra,* at 238–239, 89 S.Ct. at 417, Under *Oestereich* the statutory delinquency concept is not broad enough to authorize reclassification of registrants having a IV–D classification (ministers and divinity students). Thus, the defendants concede apparently that Behm and Caldwell are entitled to judicial review, and if they have not yet been reclassified IV–D, to a permanent injunc-

---

3. The principal decision, apparently, was Wolff v. Selective Serv. Local Bd. No. 16, 372 F.2d 817, 826 (2nd Cir. 1967). In that case, several registrants were reclassified as delinquents for participating in an anti-war demonstration. The Second Circuit held that exhaustion of administrative remedies, including submission for induction, was not required before judicial review could be had, both because the board's action was unauthorized and because of the allegation of deprivation of First Amendment freedoms. It is noted that no such deprivation is shown on this record and that

several cases cited in the majority decision rely on such deprivation.

4. Justice Douglas, the author of the *Oestereich* opinion, concurred, stating that, in his view, "it takes an extreme case where the Board can be said to flout the law, as it did in *Oestereich* * * *, to warrant pre-induction review of its actions." 393 U.S. at 260, 89 S.Ct. at 427. Such a lawless act would be, he suggested, reclassification of a registrant because he made an unpopular speech, essentially the *Wolff, supra* note 3, situation.

tion.[5] In addition, under the rationale of United States v. Worstell, 419 F.2d 762 (No. 17624, 3rd Cir. 11/7/69), Podberski is entitled to review of this reclassification from undergraduate II–S to I–A delinquent.[6] I also believe that Klinefelter, reclassified from IV–F (permanently unqualified for military service), is entitled to review.[7]

But until the holding of the majority in this case, the cases were not in dispute as to the reviewability of reclassifications affecting discretionary deferments granted pursuant to 50 U.S.C. App. § 456(h) (2).[8] There is no question that registrants are not entitled to such deferments as a matter of "statutory right."[9]

5  See Appellee's Brief at 11, n. 4. The claim of Bucher is moot as it is conceded that he is now classified IV–D.

6. Only the undergraduate II–S deferment is mandated by Congress. The graduate II–S deferment is discretionary with the local boards under 50 U.S.C.App. § 456 (h) (2). See Kolden v. Selective Serv. Local Bd. No. 4, 406 F.2d 631 (8th Cir. 1969). However, Congress has provided that once a school year is begun, the graduate student is entitled to a I–S deferment in order to finish the current school year. See, e. g., Crane v. Hershey, 410 F.2d 966 (1st Cir. 1969); Foley v. Hershey, 409 F.2d 827 (7th Cir. 1969).

7. Although there is no statutory provision requiring the deferment of persons unfit for any military service currently or in time of war or of national emergency, the President, pursuant to his power under 50 U.S.C.App. § 456(h) (2), has provided for such a classification. Executive Order No. 10,984, as amended, Exec.Order No. 11,188, 32 C.F.R. § 1622.44 (1964), provides:

"In Class IV–F shall be placed any registrant who is found under applicable physical, mental, and moral standards to be not qualified for any service in the Armed Forces either currently or in time of war or national emergency declared by Congress."

Absent further amendment, this Order grants a permanent deferment and, just as *Oestereich* found that Congress did not contemplate use of the delinquency concept to remove exemptions granted as a statutory right, I do not believe the President intended use of the delinquency regulations to abrogate that which he has ordered as a mandatory deferment in this situation. Cf. United States v. Worstell, 419 F.2d 762 (No. 17624, 3rd Cir. 11/7/69).

8. 50 U.S.C.App. § 456(h) (2) provides:

"Except as otherwise provided in this subsection the President is *authorized,* under such rules and regulations as he *may* prescribe, to provide for the deferment from training and service in the Armed Forces of any or all categories of persons whose employment in industry, agriculture, or other occupations or employment, or whose continued service in an Office * * * under the United States or any State, territory, or possession, or the District of Columbia, or whose activity in graduate study, research, or medical, dental, veterinary, optometric, osteopathic, scientific, pharmaceutical, chiropractic, chiropodial, or other endeavors is found to be necessary to the maintenance of the national health, safety, or interest: *Provided,* That no person within any such category shall be deferred except upon the basis of his individual status * * *. The President is also *authorized* * * * to provide deferment from training and service in the Armed Forces (1) of any or all categories of persons in a status with respect to persons * * * dependent upon them which renders their deferment advisable, and (2) of any or all categories of those persons found to be physically, mentally, or morally deficient or defective * * * [T]he President is also *authorized* * * * to provide for the deferment * * * of any or all categories of persons who have children, or wives and children, with whom they maintain a bona fide family relationship in their homes. No deferment [in such a case] shall be made in the case of any individual except upon the basis of the status of such individual. The President *may* * * * recommend criteria for the classification of persons subject to induction * * *, and to the extent that such action is determined by the President to be consistent with the national interest, recommend that such criteria be administered uniformly throughout the United States whenever practicable * * *." (Emphasis added.)

9. All plaintiffs, other than Behm, Caldwell, Bucher, Podbereski, and Klinefelter, possessed deferments that, under the

The majority avoids the clear limitation of *Oestereich* by holding that any postponement of judicial review following a reclassification pursuant to the delinquency regulations is unconstitutional. The case cited by the majority for its position, which position would appear to be inconsistent with Supreme Court precedent from Falbo v. United States, *supra*, to this date,[10] is Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). In *Mendoza-Martinez* two United States citizens had their citizenship revoked automatically under a statute providing for such revocation where the citizen was found to have left the country to evade the draft. The Supreme Court found that the "statute's primary function is to serve as an additional penalty for a special category of draft evader." *Id.* at 169, 83 S.Ct. at 568. Because it was such a punishment, the Court held that the plaintiffs were entitled to the safeguards of procedural due process, including notice, confrontation, compulsory process for obtaining witnesses, trial by jury and assistance of counsel. This case is readily distinguishable from the situation here.

In the first place, none of the registrants is deprived of judicial review. If they wish to challenge their reclassifications, they may do so, but under *Falbo* they must first exhaust their administrative remedies, including presenting themselves for induction to see if the Selective Service will in fact induct them. In addition to using the appeals provided for in the Military Selective Service Act, they can challenge this induction in two ways, either by defending a criminal prosecution or by petitioning for a writ of habeas corpus. Although this procedure does involve certain risks to the registrant if his contention is proven wrong, Congress chose such a method of review precisely for the purpose of avoiding the "litigious interruptions of procedures to provide necessary military manpower," such as would occur by allowing unlimited pre-induction review. Clark v. Gabriel, *supra* 393 U.S. at 258, 89 S.Ct. at 426.[11]

Secondly, the reclassification involved here is not "punishment" as that term was defined by the Court in *Mendoza-Martinez*. Whatever the motives of the local boards in choosing to enforce the regulation requiring a registrant to have his Registration Certificate and Notice of Classification in his possession at all times, the regulation itself is a valid exercise of the power given the President by Congress to provide for the classification and conscription of manpower for military service. The Supreme Court held in United States v. O'Brien, 391 U.S. 367, 377–378, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968):

"The constitutional power of Congress to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping. * * * The power of Congress to classify and conscript manpower is 'beyond question.' * * * Pursuant to this power, Congress may establish a system of registration for individuals liable for training and service, and may require such individuals within reason to cooperate with the registration system. The issuance of certificates indicating the registration and eligibility of individuals is a legitimate and substantial administrative aid to the functioning of this system. And legislation to insure the continuing availability of issued certificates

---

regulations promulgated by the President pursuant to 50 U.S.C.App. § 456(h) (2), were discretionary with the local boards.

10. For example, in Dickinson v. United States, 346 U.S. 389, 394, 74 S.Ct. 152, 156, 98 L.Ed. 132 (1953), the Supreme Court of the United States said:

"The Universal Military Training and Service Act does not permit direct judicial review of selective service classification orders.

11. There is no showing in this record that any of the plaintiffs made any attempt to challenge their reclassifications by administrative appeal, whereas in cases such as *Oestereich* and *Gabriel* administrative appeals had been exhausted by the plaintiffs.

serves a legitimate and substantial purpose in the system's administration."

The majority also holds that the delinquency regulations, if not unconstitutional, are unauthorized. However, a category for "delinquents" is explicitly mentioned in the Military Selective Service Act of 1967, 50 U.S.C.App. § 456 (h) (1).[12] This power was explicitly recognized in *Oestereich,* where the court merely found that Congress could not have intended the delinquency concept to abrogate the right of registrants to deferments mandated by Congress. I note that this is not a case where the regulations enforced require cooperation not "within reason," United States v. O'Brien, *supra,* and that it is not a case where the local board attempted to use the delinquency regulations for purposes other than enforcing Selective Service Regulations. See National Student Ass'n v. Hershey, 412 F.2d 1103, 1119 (D.C. Cir. 1969); Wolff v. Selective Serv. Local Bd. No. 16, 372 F.2d 817 (2nd Cir. 1967).

Although there is no finding of the trial court and no indication in the sparse record on appeal that the registrants in this case handed in their draft cards to protest United States policies, even if such were the case their action would not be "speech" as protected by the First Amendment. United States v. O'Brien, *supra,* 391 U.S. at 376, 88 S.Ct. 1673.[13]

For the foregoing reasons, I would include in the order remanding this case to the District Court a direction that the claims of the above-named plaintiffs should be dismissed, without prejudice, for lack of jurisdiction over the subject matter of such claims on this record.

12. Even in the absence of such a provision, an administrative agency has implicit authority to issue reasonable regulations to assist in its administration of its congressional mandate.

13. Chief Judge Bazelon noted in National Student Ass'n v. Hershey, 412 F.2d 1103, 1117 (D.C.Cir. 1969):

"While *O'Brien* was not specifically concerned with the possession regulation, the Court's rationale plainly protects the First Amendment flanks of that regulation as well. Since Local Board Memorandum No. 85 [the Hershey Directive] thus does not chill *protected* conduct, the asserted predicate for justiciability disappears."